## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RAFAEL GIL,
14122 Notley Road,
Silver Spring, Maryland  20904,

        Plaintiff,

    v.

SILVANNA DONET,
6473 Frenchmens Drive,
Alexandria, Virginia  22312,

   – and –

GLENDA RODRIGUEZ,
9508 Snyder Mill Court,
Montgomery Village, MD  20886,

        Defendants.

No. 1:19-cv-02197-TSC

The Honorable Tanya S. Chutkan

## AMENDED COMPLAINT

Plaintiff Rafael Gil, by and through his counsel, Sullivan & Cromwell LLP, for his Complaint against Silvanna Donet and Glenda Rodriguez (collectively, "Defendants"), alleges, on knowledge as to himself and his conduct and upon information and belief as to all other matters, as follows:

### NATURE OF ACTION

1.      Rafael Gil is an alcoholic.  He has struggled with this disease for most of his life. In September 2014, after spending approximately 13 months living on the street and drinking heavily every day, he decided to get sober.  He turned for help to Neighbors' Consejo, a non-profit organization in the District of Columbia that claims to support the "neediest" and "most vulnerable" members of the community.  Yet, far from providing the treatment Plaintiff was promised, Defendants—two former employees of Neighbors' Consejo—took advantage of

Plaintiff's vulnerable condition, providing inadequate treatment, forcing Plaintiff to endure sub-standard living conditions, and exploiting Plaintiff's labor.

2.      Neighbors' Consejo claims to provide free, culturally and linguistically competent mental health and rehabilitative services primarily to Latino and African-American members of the Washington, D.C. community.  In 2015, when Plaintiff was a patient, Neighbors' Consejo purported to offer "[a] twelve step recovery program [that] include[d] group intervention sessions and counseling with a licensed mental health counselor and a certified addiction counselor."  To be able to offer these services free of charge, Neighbors' Consejo relies heavily on generous grants from the District of Columbia.

3.      When Plaintiff approached Neighbors' Consejo in September 2014 to inquire about enrolling in its in-patient alcohol-abuse treatment program, Ms. Nancy Moran-Gaitan, Clinical Director of the program, and Defendant Silvanna Donet, Intake Coordinator of the program, explained that the program involved two phases:  (i) a 90-day treatment phase (the "Treatment Phase"), during which Plaintiff would receive full-time, in-patient treatment for his alcoholism; and (ii) a six-month transition phase (the "Transition Phase"), during which Plaintiff would work during the day and continue to attend group therapy and receive other treatment at night.  Based on these representations, Plaintiff agreed to participate in the in-patient program and signed a formal enrollment agreement.

4.      As it turned out, Plaintiff received only 45 days of treatment.  After 45 days, Ms. Moran-Gaitan inexplicably pulled Plaintiff out of the Treatment Phase and coerced him to work for free for Neighbors' Consejo, threatening to kick him out of the program—and return him to the streets—if he refused.

5.      About 90 days after Plaintiff arrived at Neighbors' Consejo (which was about 45 days after he had begun working for no pay), Ms. Moran-Gaitan had Plaintiff sign an employment contract with Neighbors' Consejo.  She told Plaintiff he would work from 9:00 A.M. to 5:00 P.M., Monday through Friday and would be paid $13.60 per hour.  This too proved to be false. Ms. Moran-Gaitan routinely required Plaintiff to work far more than 40 hours per week and often failed to pay him on time.

6.      In fact, Plaintiff had to wait until 2018 to recover more than $11,000 in back wages through Neighbors' Consejo's bankruptcy proceedings.  This amount did not include any overtime pay, even though Neighbors' Consejo and Defendants were legally required to compensate Plaintiff at a rate of at least one-and-a-half times his regular salary for every hour he worked in excess of 40 during a workweek.

7.      Not only was Plaintiff forced to work long hours for little or no pay, but he was also required to perform jobs for which he was unqualified and that put him in physical danger. For example, Ms. Moran-Gaitan often tasked Plaintiff with enforcing Neighbors' Consejo's house rules against other patients and collecting rent.  When patients broke the rules or were unable to pay rent, Plaintiff was responsible for kicking them out of the program.  As a result, other residents resented Plaintiff and some threatened him with physical harm, causing Plaintiff to fear for his life. When Plaintiff told Ms. Moran-Gaitan about these threats, she told him he was a "big man" who could "handle it."

8.      Throughout Plaintiff's time at Neighbors' Consejo, Defendants failed to maintain safe and sanitary residential facilities.  Patients were subjected to sub-standard living conditions in houses that lacked heat, hot water, and adequate electricity.  Defendants were aware of these sub-standard and dangerous conditions, yet did nothing to remedy them.  In fact, Ms. Donet never

even warned Plaintiff about the deplorable state of Neighbors' Consejo's housing facilities until after he signed his in-patient agreement.  Rather than using the sizeable grants Neighbors' Consejo received from the District of Columbia to improve the living conditions at Neighbors' Consejo's facilities, Ms. Donet misappropriated the funds for her own use.

9.    Had Plaintiff known of the sub-standard living conditions at Neighbors' Consejo and the inadequate alcohol-abuse treatment he would receive, he would have gone to one of the other charitable alcohol-abuse treatment facilities in the District of Columbia.  For example, La Clinica Del Pueblo offers substance-abuse services at its facility on 15th Street in Northwest Washington, D.C. and offered such services during 2014 to 2016.[1]  However, Plaintiff did not seek treatment at another facility because Defendants induced Plaintiff to enroll at Neighbors' Consejo through false statements regarding the quality of care he would receive.

10.    As a direct and foreseeable result of Defendants' conduct, Plaintiff has suffered and continues to suffer anxiety, depression, post-traumatic stress disorder ("PTSD"), difficulty sleeping, anger-management problems, and other related issues.

11.    Plaintiff brings this action for negligent infliction of emotional distress, violations of the overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, and the D.C. Minimum Wage Act, D.C. Code § 32-1003, and fraud.

### JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, specifically the FLSA, 29 U.S.C. § 201, *et seq*.  This Court has supplemental jurisdiction over Plaintiff's additional non-federal law claims pursuant to 28 U.S.C. § 1367.

---

[1]    *See* https://www.lcdp.org/locations#lcdp-15th-street.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a "substantial part of the events or omissions giving rise to the claim[s] occurred" here.

## THE PARTIES

**A.     Plaintiff**

14.     Rafael Gil is a resident of Maryland.  Plaintiff was a patient at Neighbors' Consejo from September 2, 2014 through August 30, 2016.

**B.     Defendants**

15.     Glenda Rodriguez is a resident of Maryland.  Ms. Rodriguez worked as an officer and Executive Director at Neighbors' Consejo from at least November 2014 through August 30, 2016.  As Executive Director, Ms. Rodriguez oversaw all aspects of Neighbors' Consejo's in-patient treatment programs.  She was ultimately responsible for:  (i) managing Neighbors' Consejo's facilities, including its patient residences and offices; (ii) making employment decisions, including hiring and firing employees, setting work schedules, and setting wages; (iii) raising funds; and (iv) arranging support meetings and therapy sessions.  Ms. Rodriguez was Ms. Moran-Gaitan and Ms. Donet's supervisor and, on information and belief, directed and/or was aware of and approved their activities and conduct described in this Amended Complaint.

16.     Silvanna Donet is a resident of Virginia.  Ms. Donet worked as Intake Coordinator at Neighbors' Consejo from at least September 2, 2014 through August 30, 2016.

**C.     Other Relevant Individual**

17.     Nancy A. Moran-Gaitan is a resident of Virginia.  Ms. Moran-Gaitan worked as Clinical Director and a licensed therapist for Neighbors' Consejo from at least September 2, 2014 through June 29, 2016.  She was Plaintiff's direct supervisor during the time he worked for Neighbors' Consejo and exercised control over his work responsibilities and schedule.

## STATEMENT OF FACTS

### I.   Plaintiff Sought Alcohol-Abuse Treatment From Neighbors' Consejo.

18.     Plaintiff has struggled with severe and chronic alcoholism for most of his adult life. In 2013, Plaintiff was sober for about eight months, but relapsed toward the end of the year.  As a result of this relapse, Plaintiff lost his job and his home.  He spent the next 13 months living on the street and drinking heavily every day.  During that time, he primarily stayed under a bridge on Connecticut Avenue in Washington, D.C. with about 11 other people.

19.     Around September 2014, Plaintiff decided to get sober and turned to Neighbors' Consejo for help.  Plaintiff knew of Neighbors' Consejo because he lived close to where Neighbors' Consejo was located and knew people who had received treatment there.  At the time, Neighbors' Consejo's main office was located at 3118 16th Street N.W, Washington, D.C. 20010. Since August 1, 2016, Neighbors' Consejo's main office has been located at 6323 Georgia Avenue, N.W., Suite 206, Washington, D.C. 20011.[2]

20.     On September 2, 2014, Plaintiff went to Neighbors' Consejo seeking to enroll in its alcohol-abuse treatment program.  When Plaintiff arrived at Neighbors' Consejo's main office, Ms. Moran-Gaitan greeted him.  Plaintiff told her that he was an alcoholic and needed help to get sober.  Ms. Moran-Gaitan asked to see Plaintiff's Washington, D.C. identification card and proof of insurance.  He showed her both documents.  Then, Ms. Moran-Gaitan gave Plaintiff a brief, five-minute overview of Neighbors' Consejo's in-patient alcohol-abuse treatment program.

---

[2]      *See* https://web.archive.org/web/20160806133238/http:/neighborsc.org/en/home/.

A.  **Ms. Moran-Gaitan and Ms. Donet misrepresented Neighbors' Consejo's in-patient treatment program.**

21.   Ms. Moran-Gaitan represented to Plaintiff that the in-patient treatment program at Neighbors' Consejo consisted of two phases:  (i) a 90-day in-patient treatment phase and (ii) a six-month transition phase.  Based on Ms. Moran-Gaitan's representations, Mr. Gil believed he would receive a total of nine months of treatment when he enrolled at Neighbors' Consejo.

22.   Ms. Moran-Gaitan told Plaintiff that, during the 90-day Treatment Phase, Plaintiff would receive group therapy, psychiatric services, access to a medical doctor, access to Alcoholics Anonymous meetings, and other similar services.  According to Ms. Moran-Gaitan, once Plaintiff successfully completed the Treatment Phase, he would move to a new facility and begin the six-month Transition Phase.  Ms. Moran-Gaitan told Plaintiff that, throughout the Transition Phase, he would be able to work during the day and continue to participate in Neighbors' Consejo's alcohol-abuse recovery program at night.

23.   After Ms. Moran-Gaitan gave Plaintiff an overview of the in-patient program, Ms. Donet completed Neighbors' Consejo's standard intake procedures with Plaintiff.  Ms. Donet asked Plaintiff basic questions regarding his age, substance abuse issues, and living situation, recording his answers on a written intake form.  During the intake process, Ms. Donet confirmed much of what Ms. Moran-Gaitan had said about Neighbors' Consejo's in-patient program (*e.g.*, that the Treatment Phase would last for 90 days and Plaintiff would have access to adequate medical care).  The intake process took approximately 10 to 15 minutes.

24.   Plaintiff was never formally evaluated by a medical professional to determine whether the in-patient program was an appropriate course of treatment for his disease.

25.     Relying on the representations by Ms. Moran-Gaitan and Ms. Donet concerning the nature and duration of the treatment he would receive, Plaintiff signed an agreement formally enrolling in Neighbors' Consejo's in-patient program.

26.     All of the intake procedures occurred at Neighbors' Consejo's main office.  At the time, Neighbors' Consejo also had two houses for patients.  During the Treatment Phase, patients lived in a row house next door to the main office known as "Casa Paz."  Casa Paz was located at 3120 16th Street N.W., Washington, D.C.  20010.  During the Transition Phase, patients lived in a separate row house known as "Casa Libertad," which was located at 1622 Lamont Street N.W., Washington, D.C.  20010.

**B.     Ms. Moran-Gaitan and Ms. Donet did not tell Plaintiff about the sub-standard living conditions at Casa Paz and Casa Libertad.**

27.     About an hour after Plaintiff completed the intake process, Ms. Moran-Gaitan and Ms. Donet brought Plaintiff next door to Casa Paz, where he would be living during the Treatment Phase.  Two other patients were already living in the house when Plaintiff arrived.

28.     At the time, Neighbors' Consejo did not have anyone assigned to monitor the house. One of the patients who had nearly completed the 90-day Treatment Phase took it upon himself to look out for newer patients like Plaintiff.

29.     Living conditions in Casa Paz were deplorable.  The house had no heat, no hot water, and no gas.  Plaintiff and the other residents had to wear jackets, hats, and gloves and use multiple blankets to stay warm at night, and they could only take cold showers.  The house also lacked adequate power.  While Plaintiff lived there, extension cords were run from room to room to provide electricity—a hazardous arrangement.

30.     Living conditions were also bad at Casa Libertad.  In 2013, the D.C. Health Regulation & Licensing Administration ("HRLA"), an organization responsible for licensing and

certifying health facilities for compliance with state and federal health and safety standards, conducted multiple inspections of Casa Libertad, finding several deficiencies with the facility. A report summarizing the results of a follow-up survey HRLA conducted in August 2013 concluded that, among other things, Neighbors' Consejo "failed to ensure the interior and exterior of the home was maintained in a safe and sanitary manner."[3]  As one example, the HRLA observed in a bedroom a humidifier with "a hose extending from the back through the bedroom window. The hose was positioned through several pieces of cardboard that was taped with duct tape to the resident's bedroom window . . . [with] the hose . . . hanging outside the window."  HRLA also observed, during the same inspection, sagging mattresses, soiled bedding, insufficient furniture for the number of residents housed at the facility, lack of towels, soap, or hand cleaner in the bathroom, and improper storage of the residents' medications, among other deficiencies.

31.     Defendants knew about these sub-standard living conditions. Yet Ms. Donet never said a word about them during the nearly 20 minutes she spent with Plaintiff describing the treatment program before he signed the in-patient agreement.  Moreover, the main office where Plaintiff's intake processing occurred had adequate heat and electricity, so Plaintiff had no reason to suspect that Casa Paz lacked such basic amenities.  Had Plaintiff known about the poor living conditions at Casa Paz, he would not have signed the in-patient agreement and would have sought treatment elsewhere.  Other charitable organizations in and around the District of Columbia offer similar substance-abuse treatment, but Defendants deprived Plaintiff of those alternatives by inducing him to enroll at Neighbors' Consejo through false representations concerning the quality of care he would receive.

---

[3]      *See* Statement of Deficiencies for Neighbors' Consejo Inc., D.C. Health Regul. & Licensing Admin. (Aug. 9, 2013) *available at* https://doh.dc.gov/sites/default/files/dc/sites/doh/ publication/attachments/POCfu_Neighbors%20Consejo_08012013.PDF.

## II.     Neighbors' Consejo Provided Inadequate Medical Care.

32.     During Plaintiff's first week at Neighbors' Consejo, he experienced severe alcohol withdrawal symptoms, including shaking, hallucinations, bad dreams, and difficulty sleeping. Plaintiff thought he was going to die and was in dire need of medical attention.  Plaintiff repeatedly asked to see a doctor, and Plaintiff repeatedly was told, "the doctor is coming tomorrow."  But when tomorrow came, the doctor did not.

33.     Plaintiff endured these severe withdrawal symptoms for seven or eight days before receiving any treatment or medication.  And when he finally received medication, he was given sleeping pills that did little to alleviate his suffering.

34.     Plaintiff's initial experience was typical of the sub-standard medical care he received throughout the Treatment Phase.  The sole physician employed by Neighbors' Consejo, Dr. Channavajjala Prasad, saw Plaintiff and other patients at Neighbors' Consejo infrequently, usually once a month when they would run out of medication.  Even when Dr. Prasad would meet with Plaintiff, he often failed to adequately address Plaintiff's symptoms.  In retrospect, this is unsurprising because Dr. Prasad is a psychiatrist who was being asked to provide medical care outside of his field of specialty.  Neighbors' Consejo did not employ any nurses to assist Dr. Prasad.

## III.    Defendants Coerced Plaintiff To Work For Neighbors' Consejo.

### A.     Plaintiff was forced to work for no pay.

35.     In early October 2014 (about 30 days after Plaintiff arrived at Neighbors' Consejo), Ms. Moran-Gaitan asked Plaintiff whether he would be interested in working for Neighbors' Consejo at the front desk.

36.     In late October 2014 (about 45 days after Plaintiff arrived at Neighbors' Consejo), an employee who worked as a concierge for Neighbors' Consejo quit because Defendants were

not paying her.  At that point, Ms. Moran-Gaitan asked Plaintiff to work at the front desk.  She told Plaintiff that it would be temporary; just until Neighbors' Consejo could hire someone to replace the concierge who had quit.

37.    Ms. Moran-Gaitan also represented to Plaintiff that she would only require him to work from 9:00 A.M. to 5:00 P.M. Monday through Friday and allow him to continue his treatment program.  Contrary to these representations, however, Ms. Moran-Gaitan often required Plaintiff to work far more than 40 hours per week.  He frequently was made to work nearly 24-hour days.  These long hours made it impossible for Plaintiff to continue his treatment in any meaningful way and effectively ended the Treatment Phase of Plaintiff's recovery after only 45 days, despite Ms. Moran-Gaitan and Ms. Donet's representations that he would receive 90 days of full-time, in-patient treatment.

38.    Plaintiff ultimately agreed to work for Neighbors' Consejo because he feared that, if he refused, he would be expelled from the program, leaving him homeless with no job and at high risk of relapse.  This fear was well founded.  Ms. Moran-Gaitan routinely used the threat of expulsion to compel Plaintiff to work for her against his will.

39.    For example, shortly after Plaintiff began working for Neighbors' Consejo, Ms. Moran-Gaitan instructed him to drive other residents to things like court hearings and medical appointments.  Plaintiff initially refused, telling Ms. Moran-Gaitan that he did not have a driver's license and it would be illegal for him to drive other residents.  Ms. Moran-Gaitan responded: "No, you do it or you can leave."

40.    Ultimately, Plaintiff relented.  He wanted to refuse and to run away from Neighbors' Consejo, but he had nowhere to run.  He could not go back to living under the bridge on Connecticut Avenue.

41.     When Plaintiff began working for Neighbors' Consejo in late October 2014, he was not asked to sign an employment contract.  Nor did he receive any wages.

42.     Upon information and belief, Ms. Moran-Gaitan intentionally sought to hide the fact that Plaintiff was doing work for Neighbors' Consejo when he was supposed to be in the Treatment Phase.  Ms. Moran-Gaitan instructed Plaintiff to tell health inspectors from the D.C. Department of Behavioral Health ("DBH") that he was "volunteering" for Neighbors' Consejo when they came to inspect the facilities.  Plaintiff never agreed to "volunteer" for Neighbors' Consejo.  He was coerced into working for the organization by Ms. Moran-Gaitan and the fear that he would be expelled from the in-patient program if he refused.

43.     During this time, Neighbors' Consejo received payments from Plaintiff's insurance provider to cover the costs of the treatment Plaintiff was supposed to have received.

**B.     Plaintiff signed an employment contract with Neighbors' Consejo.**

44.     In early December 2014 (about 90 days after Plaintiff arrived at Neighbors' Consejo), Plaintiff signed an employment contract with Neighbors' Consejo to memorialize the employment relationship that began approximately 45 days earlier.  The contract stated Plaintiff would receive a wage of $13.60 per hour.  Once Plaintiff signed his employment contract with Neighbors' Consejo, Neighbors' Consejo stopped collecting payments from Plaintiff's insurance provider.

45.     Even after Plaintiff signed the employment contract, Ms. Moran-Gaitan continued to require him to routinely work more than 40 hours per week.  Yet, he never received any pay for the hours he worked in excess of 40 per workweek even though federal and D.C. law require Neighbors' Consejo to pay him time and one-half his regular rate of pay for all hours worked over 40 in a workweek.  Often, Neighbors' Consejo failed to pay him for the regular hours he worked.

46.     Initially, Ms. Moran-Gaitan assigned Plaintiff to work at the front desk.  But over time, Ms. Moran-Gaitan assigned him additional responsibilities as other employees left Neighbors' Consejo.  Ms. Moran-Gaitan represented to Plaintiff that these additional duties would be temporary.  In fact, Plaintiff was never relieved of most of these responsibilities.

47.     Ms. Moran-Gaitan placed Plaintiff in charge of managing Casa Paz and Casa Libertad and supervising and monitoring other Neighbors' Consejo patients.   Plaintiff was responsible for, among other things:

- Driving other patients to court hearings and medical appointments;

- Administering drug tests to other patients;

- Administering psychiatric medication to other patients;

- Collecting rent from other patients;

- Enforcing Neighbors' Consejo's house rules and evicting patients who refused to abide by those rules;

- Recruiting new patients to Neighbors' Consejo;

- Monitoring the facilities during the day and throughout the night;

- Disposing of trash in dumpsters in the neighborhood in the middle of the night because Neighbors' Consejo lacked adequate trash collection;

- Soliciting donations of soap and shampoo from hotels; and

- Calling the police or fire department when other patients had "meltdowns."

48.     Ms. Moran-Gaitan was frequently inaccessible when difficult issues arose with other patients—many of whom were often drunk or high—and Plaintiff needed guidance on how to respond.  In December 2014, just four months after Plaintiff began his treatment program, Ms. Moran-Gaitan went to Peru and left Plaintiff alone overseeing both houses and approximately 12 patients while she was away.

49.    For several weeks, Plaintiff also worked on weekends as a cook at Chicken Palace, a restaurant owned by Ms. Moran-Gaitan located at 6030 Burke Commons Road, Suite K, Burke, Virginia  22015.  His shifts at Chicken Palace often lasted 12 hours, and when he would return to Neighbors' Consejo after working at the restaurant, he typically would find the facilities in disarray because there was no one else to supervise the facilities while Plaintiff was away.

50.    The time required and stress created by the work that Ms. Moran-Gaitan required Plaintiff to do for Neighbors' Consejo prevented Plaintiff from receiving the alcohol-abuse treatment that Ms. Donet promised when he enrolled at Neighbors' Consejo.

51.    In addition, other residents resented Plaintiff for his role enforcing Neighbors' Consejo's rules and policies against them.  Some residents threatened Plaintiff, causing him to fear for his life.  As a result of this stress, Plaintiff had trouble eating and sleeping.  Plaintiff told Ms. Moran-Gaitan about these threats, and she responded:  "Oh, you're a big man.  You can handle it."

52.    Despite these threats, Plaintiff remained at Neighbors' Consejo until August 2016 because he felt he had no other option.

**IV.    Neighbors' Consejo Ran Out of Money.**

53.    In late 2014, Plaintiff learned from Ms. Moran-Gaitan that employees were leaving Neighbors' Consejo because Neighbors' Consejo had run out of money and could no longer afford to pay their salaries.  This is the primary reason Ms. Moran-Gaitan forced Plaintiff to work for the organization and take on increasing responsibilities for which he was neither qualified nor adequately compensated.  Ms. Moran-Gaitan knew that Neighbors' Consejo lacked sufficient funds to pay employee salaries, but she also knew that she could coerce Plaintiff to work for the organization without pay because he had nowhere else to go.

54.     Public tax filings from 2014 show that Neighbors' Consejo's expenses attributable to employee wages fell by nearly 50% (from about $500,000 to just over $250,000) from 2013 to 2014.[4]

55.     In July 2015, Neighbors' Consejo filed for Chapter 11 bankruptcy.  (Ch. 11 Voluntary Petition, *In re:  Neighbors' Consejo, Inc.*, 15-000373 (Bankr. D.D.C. July 16, 2015), ECF No. 1.)

56.     In 2018, pursuant to Neighbors' Consejo's First Amended Plan of Reorganization in the bankruptcy court, Plaintiff received more than $11,000 for an allowed priority claim for wages.  This payment compensated Plaintiff for the regular hours he worked for which he did not receive pay but did not include compensation for any overtime hours worked.

57.     Initially, Plaintiff was surprised to learn of Neighbors' Consejo's financial woes. He knew that Neighbors' Consejo received substantial funding from DBH.  On one occasion, he recalls seeing a check from DBH to Neighbors' Consejo for $50,000.  On another occasion, he recalls seeing a check from DBH to Neighbors' Consejo for $35,000.

58.     However, Plaintiff later came to understand that Neighbors' Consejo lacked sufficient funding because Ms. Moran-Gaitan and Ms. Donet were misappropriating funds given to the organization for their personal use.

59.     Upon information and belief, because Plaintiff was well liked in the community, Ms. Moran-Gaitan and Ms. Donet used Plaintiff as "bait" in their scheme to recruit homeless people, who they would then enroll in Neighbors' Consejo's in-patient program in order to obtain

---

[4]     *See* Nonprofit Explorer:  Neighbors Consejo, ProPublica, *available at* https://projects. propublica.org/nonprofits/organizations/521942418 (last visited Dec. 11, 2020).

additional funds from DBH.  Rather than using these funds to pay employees and maintain Neighbors' Consejo's facilities, Ms. Moran-Gaitan and Ms. Donet would pocket the money.

60.     Ms. Moran-Gaitan would also collect rent payments from other residents at Neighbors' Consejo.  If residents were unable to pay rent, Ms. Moran-Gaitan would force them to sleep in the basement and prohibit them from using common areas or expel them from the program. Often, Ms. Moran-Gaitan would make Plaintiff expel residents who failed to pay their rent on time.

61.     On one occasion, Ms. Moran-Gaitan woke all of the residents at 7:00 A.M. and demanded they pay her rent immediately.

62.     Upon information and belief, Ms. Moran-Gaitan used the rent money she collected to pay her personal expenses.  Publicly available tax filings indicate Neighbors' Consejo did not report any rental income for the fiscal years ending September 30, 2014, September 30, 2015, and September 30, 2016.[5]

## V.     Plaintiff's Injuries.

63.     To this day, Plaintiff experiences anxiety, depression, PTSD, difficulty sleeping, anger-management problems, and other related issues as a direct and proximate result of the physical and emotional distress he endured during the nearly two years he spent at Neighbors' Consejo.

---

[5]     *See* Nonprofit Explorer:  Neighbors' Consejo, ProPublica, *available at* https://projects. propublica.org/nonprofits/organizations/521942418.

## CAUSES OF ACTION

### COUNT I

### Negligent Infliction of Emotional Distress Against Both Defendants

64.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

65.     By virtue of their positions as an officer and employee of Neighbors' Consejo, Defendants owed Plaintiff a duty to exercise care that:  (i) complies with state and federal health and safety laws, standards, and regulations for health and intermediate care facilities; and (ii) is standard and/or commensurate with the ordinary care exercised by such professionals and para-professionals in this field.

66.     Both Defendants breached that duty by failing to provide a safe, sanitary, and protective environment for Plaintiff and other patients at Neighbors' Consejo.  Specifically, Defendants:  (i) neglected to ensure that residences and treatment facilities had basic amenities like heat and hot water; (ii) failed to provide adequate medical care; and (iii) failed to employ sufficient staff to oversee the facilities and ensure patient safety and well-being.  And Ms. Donet breached her duty of care by misappropriating funds intended for Neighbors' Consejo to pay personal expenses.

67.     It was foreseeable that Defendants' conduct would cause Plaintiff severe emotional distress.  Defendants knew, or should have known, that failure to exercise due care in providing professional in-patient rehabilitative services and treatment to Plaintiff, who suffered from severe and chronic alcoholism, along with forcing Plaintiff to endure extreme working and living conditions, would cause Plaintiff severe emotional distress.

68.     Defendants' conduct did, in fact, cause Plaintiff severe emotional distress.  As a direct and proximate result of Defendants' conduct, as hereinabove alleged, Plaintiff suffered and

continues to suffer from anxiety, depression, PTSD, difficulty sleeping, anger-management problems, and other related issues.

69.     As a further direct and proximate result of Defendants' conduct, Plaintiff has incurred damages and has lost enjoyment and quality of life, and, as he is informed and believes, will continue to suffer damages and to lose enjoyment and quality of life in the future and on a permanent basis all to his damage in such a sum as may be proven at trial.

## COUNT II

### Violations of 29 U.S.C. § 207(a) Against Ms. Rodriguez

70.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

71.     The FLSA requires employers to compensate covered, non-exempt employees for "employment in excess of [40 hours in a workweek] at a rate not less than one and one-half times" their regular rate.  29 U.S.C. § 207(a)(1).

72.     Plaintiff was a covered, non-exempt employee of Ms. Rodriguez.

73.     Ms. Rodriguez is liable as an "[e]mployer" under the FLSA because she was a "person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).

74.     Ms. Rodriguez knowingly and willfully violated Section 207 of the FLSA by routinely forcing Plaintiff to work more than 40 hours in a workweek and failing to compensate him for a single hour of his employment in excess of 40 hours per workweek, at the required rate of one and one-half times his regular rate or otherwise.

75.     As a result of their violations of Section 207, Ms. Rodriguez is liable to Plaintiff for unpaid overtime compensation, liquidated damages in an amount equal to the unpaid overtime

compensation, a civil penalty in the amount of $1,100 for each violation of the FLSA, court costs, attorneys' fees and expenses, interest, and any other relief this Court may deem just and proper.

## COUNT III

### Violations of D.C. Code § 32-1003(c) Against Ms. Rodriguez

76.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

77.     Section 32-1003(c) of the D.C. Code requires employers to compensate employees for "employment in excess of 40 hours [per workweek] at a rate not less than 1 1/2 times the regular rate at which the employee is employed."  D.C. Code § 32-1003(c).

78.     Ms. Rodriguez is liable as an "employer" under Section 32-1003(c) because she was a "person[] . . . acting directly or indirectly in the interest of an employer in relation to an employee."  D.C. Code § 32-1002(3).

79.     Ms. Rodriguez knowingly and willfully violated Section 32-1003(c) by routinely forcing Plaintiff to work more than 40 hours in a workweek and failing to compensate him for a single hour of his employment in excess of 40 hours per workweek, at the statutorily required rate of one and one-half times his regular rate of pay or otherwise.  As a result of her violations of Section 32-1003(c), Ms. Rodriguez is liable to Plaintiff for unpaid overtime compensation, statutory penalties, and an additional amount as liquidated damages equal to treble the amount of unpaid overtime compensation, court costs, attorneys' fees and expenses, interest, and any other relief this Court may deem just and proper.

## COUNT IV

### Fraud Against Ms. Donet

80.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

81.     As described above, Ms. Donet made false, incorrect, or inaccurate representations and concealed material facts from Plaintiff.

82.     Specifically, Ms. Donet represented to Plaintiff that he would receive 90 days of in-patient treatment.  In truth, Plaintiff received only 45 days of in-patient treatment.  Plaintiff justifiably relied on this representation when he decided to enroll in the in-patient program at Neighbors' Consejo and when he gave up the opportunity to seek care from other substance-abuse treatment facilities.

83.     Ms. Donet also failed to inform Plaintiff that Casa Paz and Casa Libertad lacked heat, hot water, gas, and adequate electricity.  Had Plaintiff known about the sub-standard living conditions in these facilities, he would have chosen to receive treatment elsewhere rather than subjecting himself to the in-patient program at Neighbors' Consejo.

84.     Ms. Donet intended to deceive Plaintiff to encourage him to enroll in the in-patient program because, by increasing enrollment, Neighbors' Consejo could seek additional funding from the District of Columbia and collect payments from Plaintiff's insurance provider, which Ms. Donet could then misappropriate for her personal use.

85.     As described above, the stress induced by Plaintiffs' employment with Neighbors' Consejo caused lasting emotional distress.

86.     As a result of her fraudulent statements, Ms. Donet is liable to Plaintiff for damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendants as follows:

a.     on the First Cause of action, awarding Plaintiff compensatory damages (including medical and all related expenses) and punitive damages for Defendants' negligent infliction of emotional distress, as described above;

b.      on the Second Cause of Action, awarding Plaintiff unpaid overtime compensation, liquidated damages in an amount equal to the unpaid overtime compensation, a civil penalty in the amount of $1,100 for each violation of the FLSA, and interest;

c.      on the Third Cause of Action, awarding Plaintiff unpaid overtime compensation, statutory penalties, and an additional amount as liquidated damages equal to treble the amount of unpaid overtime compensation, and interest;

d.      on the Fourth Cause of Action, awarding Plaintiff damages in an amount to be determined at trial;

e.      awarding Plaintiff his expenses of litigation, including reasonable attorneys' fees;

f.      entering judgment declaring that Defendants are jointly and severally liable for all losses that Plaintiff has incurred or may incur relating to, resulting from, or arising out of each Count in the Amended Complaint in which each Defendant is named; and

g.      granting Plaintiff such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

87.     Plaintiff hereby requests a jury trial on all issues of fact, including the measure of damages.

Dated:   August 9, 2023
          Washington, D.C.

Respectfully submitted,

/S/  *Amanda F. Davidoff*
Amanda Flug Davidoff (Bar No. 978033)
Tracy Nelson Wirth (D.D.C. Bar ID D00573)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006
Telephone:  (202) 956-7500
Facsimile:  (202) 293-6330
davidoffa@sullcrom.com
wirtht@sullcrom.com

*Counsel for Plaintiff Rafael Gil*